Michael R. Mills, Esq.
DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501-5907
Telephone: (907) 276-4557
Facsimile: (907) 276-4152
Email: mills.mike@dorsey.com

J.B. Evans, *admitted pro hac vice*
DORSEY & WHITNEY LLP
101 South Capitol Boulevard, Suite 1701
Boise, ID 83702
Telephone: (208) 617-2528
Facsimile: (208) 545-5343
Email: evans.jb@dorsey.com

Proposed Co-Counsel for Debtor

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In Re:<br><br>YAK TIMBER, INC., an Alaska corporation,<br><br><div align="center">Debtor.</div> | Case No. 23-00080 GS<br><br>(Chapter 11) |

## <u>COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION DATED NOVEMBER 14, 2023</u>

## <u>TABLE OF CONTENTS</u>

PART ONE: DISCLOSURE STATEMENT ......................................................................... 6

ARTICLE 1.  BACKGROUND REGARDING DEBTOR, ITS ASSETS, AND THE
CASE ............................................................................................................. 8
    A.    History and Nature of Debtor's Business Activities .................................. 8
    B.    AgWest Loans ........................................................................................ 8
    C.    Debtor's Assets ...................................................................................... 8
    D.    Ownership of Equity Interests: Kwaan .................................................... 9
    E.    Affiliate Entities ................................................................................... 9
    F.    Pending Legal Proceedings .................................................................... 9
    G.    Continuation of Directors, Executive Officers, and Management ........... 10
    H.    Financial Information ........................................................................... 10
    I.    Summary of Bankruptcy Case Events ................................................... 11

ARTICLE 2.  BACKGROUND REGARDING PROPOSED PLAN ................................... 12
    A.    Formulation of the Plan ....................................................................... 12
    B.    Plan Treatment of Claims .................................................................... 12
    C.    Alternatives to the Plan ....................................................................... 15
    D.    Liquidation Analysis ........................................................................... 15
    E.    Means of Implementation of the Plan .................................................... 16

ARTICLE 3.  RISK FACTORS ........................................................................................ 17

PART TWO: PLAN OF LIQUIDATION ............................................................................ 18

ARTICLE 4.  CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS UNDER THE PLAN ................................................................ 18

CLASS 1 – AGWEST SECURED CLAIM ................................................................ 18
    A.    Impairment and Voting ........................................................................ 18
    B.    Treatment ........................................................................................... 18

CLASS 2 – PETRO 49 SECURED CLAIM ............................................................... 19
    A.    Impairment and Voting ........................................................................ 19
    B.    Treatment ........................................................................................... 19

CLASS 3 – BKL SECURED CLAIM ........................................................................ 19
    A.    Impairment and Voting ........................................................................ 19
    B.    Treatment ........................................................................................... 19

CLASS 4 – PRIORITY UNSECURED CLAIMS ....................................................... 19
    A.    Impairment and Voting ........................................................................ 19
    B.    Treatment ........................................................................................... 19

CLASS 5 – GENERAL UNSECURED CLAIMS
    A.    Impairment and Voting ........................................................................ 19
    B.    Treatment ........................................................................................... 19

CLASS 6 – EQUITY INTERESTS ........................................................................... 20

A.   Impairment and Voting ........................................................................ 20
B.   Treatment ......................................................................................... 20

UNCLASSIFIED CLAIMS ............................................................................... 20
A.   Treatment ......................................................................................... 20
B.   Administrative Claims Bar Date ...................................................... 20
C.   U.S. Trustee Fees ............................................................................. 20
D.   Allowed Professional Compensation and Expenses ........................ 20
E.   Other Allowed Administrative Expense Claims ............................... 20

ARTICLE 5.  MEANS FOR IMPLEMENTATION OF THE PLAN .................................. 20
A.   Liquidation Cooperation Agreement ............................................... 20
B.   Debtor Liquidation of Retained Assets ............................................ 21
C.   Completion of Liquidation ............................................................... 21
D.   Section 1146(a) Exemption .............................................................. 21

ARTICLE 6.  PROVISIONS REGARDING VOTING AND DISTRIBUTIONS
UNDER THE PLAN AND TREATMENT OF DISPUTED,
CONTINGENT, AND UNLIQUIDATED ADMINISTRATIVE
EXPENSE CLAIMS, CLAIMS AND EQUITY INTERESTS ........................... 22
A.   Voting of Claims and Equity Interests ............................................. 22
B.   Nonconsensual Confirmation .......................................................... 22
C.   Method of Distributions Under this Plan ......................................... 22
D.   Disposition of and Distributions Withheld for Disputed Claims ........... 22
E.   Distributions Upon Allowance of Disputed Claims ......................... 23
F.   Surplus Distributions to Holders of Allowed General Unsecured
Claims .............................................................................................. 23
G.   Objections to and Resolution of Administrative Expense Claims,
Claims and Equity Interests ............................................................ 23

ARTICLE 7.  CONDITIONS TO THE EFFECTIVE DATE; SUBSTANTIAL
CONSUMMATION ......................................................................................... 24
A.   Confirmation Order .......................................................................... 24
B.   Other Conditions ............................................................................. 24
C.   Substantial Consummation .............................................................. 24

ARTICLE 8.  EFFECT OF PLAN CONFIRMATION ............................................... 24
A.   No Discharge .................................................................................... 24
B.   Good Faith ....................................................................................... 24
C.   Injunction ......................................................................................... 24
D.   Tax Consequences ............................................................................ 25

ARTICLE 9.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ......................................................................................................... 26
A.   Rejection of Executory Contracts and Unexpired Leases ................ 26
B.   Approval of Assumption or Rejection of Executory Contracts and
Unexpired Leases ............................................................................. 26
C.   Procedure ......................................................................................... 26
D.   Compensation and Benefit Programs ............................................... 26

ARTICLE 10.  MISCELLANEOUS ................................................................................ 27
    A.    Effectuating Documents and Further Transactions.................................... 27
    B.    Corporate Action...................................................................................... 27
    C.    General Retention of Jurisdiction ............................................................. 27
    D.    Specific Retention of Jurisdiction ............................................................ 27
    E.    Exculpation ............................................................................................. 27
    F.    Amendment or Modification of this Plan .................................................. 28
    G.    Reservation of Rights............................................................................... 28
    H.    Severability ............................................................................................. 28
    I.    Revocation or Withdrawal of this Plan ..................................................... 28
    J.    Binding Effect......................................................................................... 28
    K.    Notices .................................................................................................... 28
    L.    Governing Law ........................................................................................ 29
    M.    Withholding and Reporting Requirements ............................................... 29
    N.    Allocation of Plan Distributions Between Principal and Interest ............. 29
    O.    Headings ................................................................................................. 29
    P.    Exhibits .................................................................................................. 29
    Q.    Filing of Additional Documents .............................................................. 29

## EXHIBITS

A.    Term Sheet;

B.    Liquidation Cooperation Agreement;

C.    Liquidation Analysis.

## INTRODUCTION AND SUMMARY OF PROPOSED PLAN

Yak Timber, Inc. ("***Yak Timber***" or "***Debtor***"), as Debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case, proposes this Combined Disclosure Statement and Plan of Liquidation ("The Plan") pursuant to Sections 1125 and 1129 of the Bankruptcy Code.[1]

The Plan contemplates the liquidation of all of Debtor's assets and a distribution of net proceeds from the liquidation, primarily to its senior secured creditor, AgWest Farm Credit Services, PCA (together with Northwest Farm Credit Services, PCA, "***AgWest***"), as well as other payments to secured creditors, administrative expense claimants, priority unsecured creditors, and, if there are sufficient proceeds from the sale of Retained Assets (defined below), a distribution of up to 10% to general unsecured creditors. Any excess available funds after a 10% distribution to general unsecured creditors will be paid to AgWest to the extent it is still owed money after the liquidation of the Relief Assets (defined below). The Plan has been formulated based on the agreements set forth between Debtor, AgWest, and Yak Tat Kwaan, Inc. ("***Kwaan***"), included in the Term Sheet, dated as of October 2, 2023, and attached hereto as **Exhibit A** (the "***Term Sheet***"), and the Liquidation Cooperation Agreement, dated as of November 1, 2023, and attached hereto as **Exhibit B** (the "***Liquidation Cooperation Agreement***"). The Debtor and AgWest are negotiating the terms of a Plan Support Agreement consistent with the terms of the Term Sheet. The Plan will be implemented through two primary steps:

1.     **Liquidation of Relief Assets**: Debtor, AgWest, and Kwaan have agreed to cooperate to liquidate the Relief Assets (as defined in the Term Sheet), pursuant to the terms of the Liquidation Cooperation Agreement. AgWest, as the senior-secured lender, is entitled to the proceeds of the sale of the Relief Assets up to the full amount of its Allowed Claim. AgWest has received relief from the bankruptcy automatic stay to exercise its rights with respect to the Debtor's collateral and liquidate the Relief Assets. The Liquidation Cooperation Agreement facilitates the Bank's liquidation while indemnifying the estate from bearing any of the costs of the liquidation process, although AgWest can add costs of liquidation to its debt.

2.     **Liquidation of Retained Assets**: As set forth in the Term Sheet, the Debtor will be permitted to sell certain Retained Assets (as defined in the Term Sheet) and, after notice and upon motion to the Court, to distribute the proceeds generated from the sale of Retained Assets to administrative expense claimants, priority unsecured creditors, and, depending on the amount of the net proceeds generated by the sale of the Retained Assets, up to a 10% distribution to general unsecured creditors. Any excess available funds, after a 10% distribution to general unsecured creditors, will be paid to AgWest to the extent it is still owed money after the liquidation of the Relief Assets.

---

[1] Codified in Title 11 of the United States Code, as amended, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"). Unless otherwise indicated, all "***Chapter***" and "***Section***" references are to the Bankruptcy Code and all "***Rule***" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037. Certain capitalized terms used in this Introduction and Summary of Proposed Plan have the meanings ascribed to them in the "Definitions" section immediately below.

## DEFINITIONS

For purposes of this Combined Plan and Disclosure Statement, all capitalized terms not otherwise defined herein shall have the meaning assigned to them in this Definitions section, except for the following terms, which have the meanings ascribed to them in the foregoing "Introduction and Summary of Proposed Plan: "*AgWest*"; "*Debtor*"; "*Kwaan*"; "*Liquidation Cooperation Agreement*"; "*Plan Support Agreement*"; "*Term Sheet*"; and "*Yak Timber*".

"*Administrative Expense Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estate of Debtor, any actual and necessary costs and expenses of operating the business of Debtor, any indebtedness or obligations incurred or assumed by Debtor-in-Possession in connection with the conduct of its business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under Sections 330 or 503 of the Bankruptcy Code and any fees or charges assessed against the estates of Debtor under Section 1930 of Chapter 123 of Title 28 of the United States Code.

"*Allowed*" means, with reference to any Claim or Equity Interest, (a) any Claim against or Equity Interest in Debtor which has been listed by Debtor in its Schedules, as such Schedules may be amended by Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim or Equity Interest has been filed, (b) any Claim or Equity Interest Allowed hereunder, (c) any Claim or Equity Interest which is not Disputed, or (d) any Claim or Equity Interest which, if Disputed, (i) as to which, pursuant to this Plan or a Final Order of the Bankruptcy Court, the liability of Debtor and the amount of this plan are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (ii) has been Allowed by Final Order; *provided, however*, that any Claim or Equity Interest allowed solely for the purpose of voting to accept or reject this Plan pursuant to a Final Order of the Bankruptcy Court shall not be considered an "Allowed Claim" or "Allowed Equity Interest" hereunder.  Unless otherwise specified herein or by Final Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of computation of distributions under this Plan, include interest on such Allowed Claim from and after the Commencement Date.

"*AgWest*" means AgWest Farm Credit, PCA (f/k/a Northwest Farm Credit Services, PCA).

"*AgWest Collateral*" means the Collateral securing the AgWest Secured Claim as described in its Proof of Claim filed in the Case.

"*AgWest Secured Claim*" means any and all indebtedness of Yak Timber to AgWest, evidenced by (i) that certain Loan Agreement, dated June 23, 2020, in the principal amount of $5,700,000, by and among Northwest Farm Credit Services, PCA, Northwest Farm Credit Services, FCLA, and Yak Timber; (ii) that certain Note, dated January 10, 2022, in the principal amount of $4,000,000, by Yak Timber in favor of Northwest Farm Credit Services, PCA; (iii) that certain Note, dated March 25, 2021, in the principal amount of $600,000, by Yak Timber in favor of Northwest Farm Credit Services, PCA; (iv) that certain Amended and Restated Note, dated January 10, 2022, in the principal amount of $3,375,000, by Yak Timber in favor of Northwest Farm Credit Services, PCA; (v) that certain Note, dated January 10, 2022, in the principal amount

of $750,000, by Yak Timber in favor of Northwest Farm Credit Services, PCA; (vi) that certain Security Agreement, dated June 23, 2020, amended on March 25, 2021, and January 1, 2022, by and between Northwest Farm Credit Services, PCA and Yak Timber; (vii) that certain Preferred Ship Mortgage, dated February 3, 2022, amended June 13, 2022, in the principal amount of $13,600,000 and later amended in the amount of $14,425,000, by and between Yak Timber and Northwest Farm Credit Services, PCA; (viii) any and all modifications, extensions, and amendments to such indebtedness; and (ix) any and all Loan Documents with respect to such obligations and Claim. *See* AgWest Proof of Claim No. 18, filed on September 13, 2023, in the amount of $13,856,829.39, which continues to accrue interest and costs.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Alaska having jurisdiction over the Chapter 11 Case.

"***Business Day***" means any day other than a Saturday, Sunday, or any other day on which commercial banks in Anchorage, Alaska, are required or authorized to close by law or executive order.

"***Cash***" means legal tender of the United States of America and equivalents of this Plan.

"***Cause of Action***" means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law, equity or otherwise.

"***Chapter 11 Case***" means the case under Chapter 11 of the Bankruptcy Code involving Debtor, styled *In re Yak Timber. Inc.,* Chapter 11 Case No. 23-00080 GS, currently pending in the Bankruptcy Court.

"***Claim***" has the meaning set forth in Section 101 of the Bankruptcy Code.

"***Claimant***" means the holder of a Claim against Debtor.

"***Class***" means a category of holders of Claims or Equity Interests as set forth in Article 4 of this Plan.

"***Collateral***" means any property or interest in property of the estate of Debtor subject to a Lien or Security Interest to secure the payment or performance of a Claim, which Lien or Security Interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

"***Commencement Date***" means May 11, 2023, the date on which the order for relief was entered commencing the Chapter 11 Case.

"***Confirmation Date***" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

"***Confirmation Hearing***" means the hearing held by the Bankruptcy Court to consider confirmation of this Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the Final Order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

"***Debtor-in-Possession***" means Debtor in its capacity as debtor-in-possession in the Chapter 11 Case pursuant to Sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

"***Disclosure Statement***" means the disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

"***Disputed***" means the portion (including, when appropriate, the whole) of any Claim which is: (a) subject to timely objection interposed by Debtor or any party in interest entitled to file and prosecute such objection in the Chapter 11 Case, if at such time such objection remains unresolved; (b) a Claim that is listed by Debtor as disputed, unliquidated, or contingent in the Schedules; or (c) if no objection has been timely filed, a Claim which has been asserted in a timely, filed proof of claim in an amount greater than or in a Class different that that listed by Debtor in the Schedules as liquidated in amount and not disputed or contingent, provided, however, that the Bankruptcy Court may estimate a Disputed Claim for purposes of allowance pursuant to Section 502(c) of the Bankruptcy Code. The term "Disputed" when used to modify a reference in this Plan to any Claim or Class of Claims shall mean a Claim (or any Claim in such Class) that is a Disputed Claim as defined herein. In the event there is a dispute as to classification or priority of a Claim, it shall be considered a Disputed Claim in its entirety. Until such time as a Contingent Claim becomes fixed and absolute, such Claim shall be treated as a Disputed Claim and not an Allowed Claim for purposes of voting, allocations, and distributions under this Plan.

"***Disputed Claim Amount***" means the higher of the amount set forth in the proof of Claim or listed on the Schedules relating to a Disputed Claim; provided, however, if a Disputed Claim is estimated for allowance purposes under Section 502(c) of the Bankruptcy Code, the amount so estimated pursuant to Final Order of the Bankruptcy Court shall be the Disputed Claim Amount.

"***Distribution Date***" means each date on which a payment is made with respect to each Allowed Claim as provided under this Plan.

"***Effective Date***" means the first Business Day on which the conditions specified in ARTICLE 7 of this Plan have been satisfied or waived in accordance with this Plan.

"***Encumbered Assets***" means all of Debtor's timber rights, machinery, vessels (*in rem*), equipment, vehicles, proceeds, and after-acquired property, in each case as encumbered by the AgWest Loans.

"***Equity Interest***" means any share of common stock or other instrument evidencing an ownership interest in Yak Timber, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

"***Estate***" means Debtor's Chapter 11 bankruptcy estate.

"***Final Distribution Date***" means the last Distribution Date upon which Debtor makes distributions in accordance with and pursuant to the terms of this Plan.

"***Final Order***" means an order entered by the Bankruptcy Court that has not been reversed, stayed, modified, or amended, and from which the time to appeal or seek review or rehearing has expired without an appeal having been filed or review or rehearing having been sought, or if an appeal has been taken (or review or rehearing sought), Yak Timber, in its sole and absolute discretion, has agreed, in writing, to proceed notwithstanding such appeal (or review or rehearing).

"***General Unsecured Claim***" means any Unsecured Claim.

"***IFP***" means International Forest Products LLC, a Delaware limited liability company.

"***Lien***" has the meaning set forth in Section 101 of the Bankruptcy Code.

"***Loan Documents***" means any and all loan and security documents, including, but not limited to, promissory notes, security agreements, financing statements, and invoices evidencing, securing, or relating to obligations and a Claim.

"***Person***" has the meaning set forth in Section 101(41) of the Bankruptcy Code.

"***Plan***" means this Chapter 11 plan of liquidation, including, without limitation, all exhibits, supplements, appendices, and schedules, if any, either in its present form or as the same may be altered, amended, or modified from time to time.

"***Priority Unsecured Claim***" means any Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code and any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code.

"***Pro Rata Share***" means a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Equity Interest in a Class to the amount of such Allowed Claim or Allowed Equity Interest is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims or Allowed Equity Interests in such Class to the amount of all Allowed Claims or Allowed Equity Interests in such Class.

"***Relief Assets***" shall mean all of Debtor's assets constituting collateral (and proceeds of same) to AgWest, except for the Retained Assets.

"***Reserve***" shall have the meaning set forth in ARTICLE 6(D) of this Plan

"***Retained Assets***" shall mean: (1) all cash in the Estate (as of the date of the Term Sheet, approximately $160,000), (2) the Steel Building and related building materials, (3) proceeds of a collection action entitled *Yak Timber, Inc. v. Bethel Environmental Solutions, LLC*, (U.S.D.C. Alaska, Case No. 3:22-ov 00266 JMK), (4) five fuel tanks, (5) Assignment of Timber Rights from Kwaan (no value); and (6) Debtor's membership interest in Superior General Contracting, LLC, an Alaska limited liability company (potential value of approximately $100,000 based on an account receivable owed to it by Bethel Environmental Solutions, LLC).

"***Schedules***" means the schedules of assets and liabilities, the list of holders of Equity Interests, and the statements of financial affairs filed by Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto through the Confirmation Date.

"***Secured Claim***" means any Claim, to the extent reflected in the Schedules or a proof of Claim as being secured by a Lien or Security Interest (whether consensual or otherwise), to the extent it is secured by a valid, unavoidable Lien or Security Interest in Collateral, to the extent of the value of the Estate's interest in such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code and taking into account any other Secured Claims with respect to such Collateral not inferior in priority to such Secured Claim, or, in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

"***Security Interest***" has the meaning set forth in Section 101 of the Bankruptcy Code.

"***Surplus Distributions***" means (i) distributions under this Plan to holders of Allowed Claims that are unclaimed for a period of three months after Final Distribution Date; and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the Cash in the Reserve over the amount of Cash actually distributed on account of such Disputed Claim.

"***Unsecured Claim***" means any Claim that is not a Secured Claim, Administrative Expense Claim, or Priority Unsecured Claim.

"***Yak Timber Common Stock***" means the issued and outstanding shares of stock in Yak Timber.

## PART ONE: DISCLOSURE STATEMENT

Debtor submits this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, Local Bankruptcy Rule 3017-2(c), and the Stipulation between Debtor, AgWest, Kwaan, and the Office of the United States Trustee. The purpose of this Disclosure Statement is to enable you, as the holder of a Claim against or Equity Interest in Debtor, to make an informed decision with respect to voting on acceptance or rejection of the Plan. The Plan provides for the prompt liquidation of all of the Debtor's assets and distribution of all proceeds in accordance with the Term Sheet, the Liquidation Cooperation Agreement, the Plan Support Agreement, the terms of the Plan itself, the Bankruptcy Code, and applicable non-bankruptcy law.

All persons receiving this Disclosure Statement and the Plan of Liquidation attached hereto are urged to review fully the provisions of the Plan and all other exhibits attached hereto, in addition to reviewing the text of this Disclosure Statement. This Disclosure Statement is not intended to replace a careful review and analysis of the Plan. Rather, it is submitted as an aid in your review of the Plan and in an effort to explain the terms and implications of the Plan. Every effort has been made to explain fully the various aspects of the Plan as it affects all holders of Claims and Equity Interests. However, to the extent any questions arise, Debtor urges you to seek independent legal advice.

In accordance with Section 1125(f) of the Bankruptcy Code and Local Bankruptcy Rule 3017-2(c), the United States Trustee in accordance with Local Bankruptcy Rule 3017-2(c) has determined that this Disclosure Statement as containing information of a kind and in sufficient detail, adequate to enable holders of Claims against or Equity Interests in Debtor, whose votes on the Plan are being solicited, to make an informed judgment whether to accept or reject the Plan, subject to final approval of the Disclosure Statement at the Confirmation Hearing.

You should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code, and no person has been authorized to utilize any information concerning Debtor or its business other than the information contained in this Disclosure Statement or in other information approved for dissemination to holders of Claims or Equity Interests by the Bankruptcy Court. You should not rely on any information relating to Debtor and its business, other than that contained in this Disclosure Statement, the Plan, and the exhibits attached thereto, except as otherwise approved by the Bankruptcy Court.

**THE DESCRIPTION HEREIN OF THE PLAN IS A SUMMARY ONLY AND HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN. IN THE EVENT THAT ANY INCONSISTENCY OR CONFLICT EXISTS BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, NO REPRESENTATIONS CONCERNING DEBTOR, ITS ASSETS, PAST OR FUTURE BUSINESS OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR DEBTOR.**

**THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND NO FAIRNESS OPINION HAS BEEN OBTAINED REGARDING THE VALUE OF THE ASSETS AND THE AMOUNT OF THE LIABILITIES. WHILE EVERY EFFORT HAS BEEN MADE BY DEBTOR TO PROVIDE ACCURATE INFORMATION HEREIN, DEBTOR AND ITS LEGAL AND FINANCIAL ADVISORS CANNOT AND DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ANY INACCURACY.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

EACH HOLDER OF AN IMPAIRED CLAIM OR AN IMPAIRED EQUITY INTEREST SHOULD REVIEW THE ENTIRE PLAN AND SEEK THE ADVICE OF ITS OWN COUNSEL BEFORE CASTING A BALLOT.

Yak Timber provides the following background information concerning its history and assets, the events leading up to and occurring during its bankruptcy Case, and various matters concerning its Chapter 11 Plan. Debtor believes this Disclosure Statement provides all creditors of Yak Timber with adequate information to make a decision whether to accept, reject, or object to confirmation of the Plan.

## ARTICLE 1.
## BACKGROUND REGARDING DEBTOR, ITS ASSETS, AND THE CASE

**A.** **History and Nature of Debtor's Business Activities**. Debtor is a wholly-owned subsidiary of Kwaan. Debtor was formed on July 13, 2018, to harvest timber on land owned by Kwaan and then export the harvested timber internationally or through various logging agreements. Prior to the incorporation of Debtor, Kwaan struggled to generate revenue and relied primarily on Section 7(j) revenue sharing under ANCSA to pay its expenses. The Board of Directors of Kwaan (the "***Board***") decided harvesting timber from its own land would be the best path forward to increasing revenue and profit.

At the time, Kwaan held 1,800 acres of old growth forest that was suitable for timber logging. Kwaan created Debtor and assigned its timber rights to Debtor, which included old growth forests on Khantaak Island, Alaska. Debtor proceeded to harvest the old growth timber located on the 1,800 acres and was moving operations to selective harvesting on Khantaak Island, Alaska, when Debtor met opposition from the local Yakutat community, environmental groups, and its own shareholders. At the time Debtor was pursuing selective harvesting opportunities on Khantaak Island, Alaska, it was also in conversations with the State of Alaska Division of Forestry (the "***DOF***") regarding the harvest of timber in Icy Bay, Alaska, from land owned by the Alaska Mental Health Trust.

After the opposition, Debtor attempted to work with certain groups for selective harvesting of the old growth timber on Khantaak Island, Alaska, but public pressure forced Debtor to cease operations both on Khantaak Island, Alaska, and with the DOF for harvesting in Icy Bay, Alaska. In an October 4, 2022, letter to Kwaan shareholders (the "***Shareholder Letter***"), the Board of Directors for Kwaan announced their decisions to wind down and dissolve the Debtor. By November 2022, after the Shareholder Letter, Debtor was unable to make payments on the AgWest Loans. Debtor briefly attempted to pursue other forms of resource-based revenue ideas on the timber land, including carbon credits, but no business operations were feasible or profitable enough to cover the compounding interest on the AgWest

Loans. After attempts to restructure the debt and, eventually, a lawsuit against the tug and barge and the Debtor itself, the Debtor filed a Chapter 11 petition on May 11, 2023.

**B.**    **AgWest Loans**.  In the summer of 2020, Northwest Farm Credit Services, PCA ("*NFCS*"), now known as AgWest made a series of loans to the Debtor as detailed in its Proof of Claim No. 18 (the "*AgWest Loans*").  Debtor needed funding to purchase a tug and barge for transportation of its harvested timber.  Debtor vetted numerous lenders but eventually settled on loan terms with AgWest.  The AgWest Loans were made to assist Debtor with financing the purchase of the tug and barge, logging equipment, and providing a line of credit to pay the fees and costs in connection with funding the Debtor's timber harvesting operations.  Pursuant to the granting documents described in its Proof of Claim No. 18 (the "*Granting Documents*"), all of Debtor's timber rights, machinery, vessels (*in rem*), equipment, vehicles, proceeds, and after-acquired property was encumbered by the AgWest Loans.  NFCS perfected a senior-first position lien on all assets of the Debtor.

As a result of environmental activism and subsequent cessation of logging operations, Debtor struggled to make payments to NFCS starting in early-mid 2022 and stopped making payments all together in November 2022 following the Shareholder Letter.  Initially, Debtor was working with AgWest to negotiate a settlement to continue paying the amounts owed under the AgWest Loans, but during that time NFCS merged with Farm Credit West, PCA, and the surviving entity, AgWest, commenced a case *in rem* against the vessels and *in personam* against Yak Timber and Kwaan for the defaulted payments under the AgWest Loans

**C.**    **Debtor's Assets**.  The Granting Documents encumber all of the assets of Debtor, including the tug and barge.  AgWest holds a senior-first position lien on all of the Encumbered Assets, which was estimated to be valued at $14.1 million by the Debtor in its Motion to Use Cash Collateral and Find That Creditor Is Adequately Protected and Authority to Provide a Replacement Lien. [Dkt. No. 31].  However, AgWest valued the Encumbered Assets at approximately $10 million at the September 19, 2023, evidentiary hearing.

The Debtor's Relief Assets shall be sold and used to pay up to the full amount of the AgWest Secured Claim.  The Debtor is permitted to sell the Retained Assets for the benefit of other creditors pursuant to the terms of the Liquidation Cooperation Agreement and the Plan.

The Debtor does not currently anticipate filing any actions pursuant to Chapter 5 of the Bankruptcy Code.  The Debtor's investigation of such claims is ongoing and the proceeds of any such avoidance actions shall be treated in the same manner as the proceeds of the sale of Retained Assets.  The Debtor shall provide all parties-in-interest with a notice of intent with respect to Chapter 5 avoidance actions on or before December 1, 2023.

**D.**    **Ownership of Equity Interests: Kwaan**.  Kwaan is the sole owner of all of Debtor's issued and outstanding stock.  Kwaan's address is P.O. Box 416, Yakutat, Alaska 99689.  There are 100 authorized shares of Debtor stock and all 100 shares are issued to Kwaan.  No securities will be issued in connection with the consummation of the Plan.  Kwaan has made capital contributions to Debtor to support its reorganization during the Bankruptcy Case.  Kwaan is a guarantor of Debtor's obligations to AgWest.

**E.**    **Affiliate Entities**.  Debtor is fully owned by Kwaan, its parent company.  Debtor has one wholly-owned subsidiary, Superior General Contracting, LLC, an Alaska limited liability

company.  The only known asset of Superior General Contracting, LLC, is an account receivable of approximately $100,000 owed to it by Bethel Environmental Solutions, LLC ("**Bethel**").  The Debtor is seeking to collect the amount due in connection with the mediation related to the Bethel Litigation described immediately below.

       **F.**    <u>**Pending Legal Proceedings**</u>.  Debtor is currently involved in the following legal proceedings:

       1.    *Yak Timber, Inc. v. Bethel Environmental Solutions, LLC*, U.S. District Court for Alaska, Case No. 3:22-ov 00266 JMK (the "**Bethel Litigation**").  Debtor is seeking to collect a receivable from Bethel in an amount not less than $447,000, which is subject to offset by Bethel's counterclaims for material misrepresentation and breach of contract.  Debtor's rights in this litigation are a Retained Asset.  Any damages received by Debtor are considered Retained Assets pursuant to the Term Sheet.  Bethel also owes the Debtor's fully-owned subsidiary, Superior General Contracting, LLC approximately $100,000 for hauling toxic soil.  Debtor's interest in Superior General Contracting, LLC's, claim against Bethel is a Retained Asset.

       Debtor is working with counsel for Bethel to stipulate to limited stay relief to allow the Bethel Litigation for the limited purpose of conducting mediation in December 2023.

       2.    *Alaska National Insurance Company v. Yak Timber, Inc*., Alaska District Court in Yakutat Case No. 1YA-23-00003CI (the "**ANIC Litigation**").  Alaska National Insurance Company ("**ANIC**") filed this case to collect debt (a $11,111 unsecured claim) incurred by Debtor from April 19, 2022, to October 25, 2022, for failure to pay its workers' compensation insurance premium.  The case is currently subject to the automatic stay imposed in this Chapter 11 Case.  ANIC's claim will be dealt with in the claims process in this Bankruptcy Case, with the intent to then stipulate to dismissal of the ANIC Litigation.

       3.    *Spigai et al v. Yak Timber, Inc. et al*, Alaska District Court in Ketchikan, Case No. 1KE-23-00082CI (the "**Spigai Litigation**").  Spigai claimed he was owed $41,500.79 for work performed as a forester to prepare standing timber harvested by Debtor at Humpback Creek, Alaska, for sale in the fall of 2022.  The case was subject to the automatic stay issued in this Chapter 11 Case.  Spigai recently filed a notice of withdrawal of his claim [Dkt. No. 116] after entering into a settlement agreement with IFP.  The case is still active but will be dismissed in the near future.

       4.    *AgWest Farm Credit v. Kimberly C, O.N. 596518 et al.*, Alaska District Court at Ketchikan, Case No. 1KE-23-00082CI (the "**AgWest Litigation**").  Following Debtor's failure to pay amounts owed under the AgWest Loans, AgWest brought this action against the Kimberly C tug *in rem* and against Debtor *in personam*.  The case is currently subject to the automatic stay imposed in the Chapter 11 Case, but, pursuant to the Term Sheet, AgWest will be granted a partial relief from stay to sell the tug and barge to cover a portion of the AgWest Secured Claim, and upon confirmation of the Plan, this AgWest Litigation can be dismissed.

       5.    *State of Alaska v. Yak Timber* is a wage and hour claim-enforcement action brought by the Alaska Department of Labor and Workforce Development for a post-petition wage claim of Joshua Ewings in the amount of approximately $7,800.  Much of Mr. Ewings' claim has been paid, and the remaining unpaid amount shall be treated as an administrative claim and be paid as an Administrative Expense Claim if it has not already been paid in full before confirmation.

**G.** **Continuation of Directors, Executive Officers, and Management**. Debtor has retained Marvin Adams as a continuing employee as its CEO for the purpose of (a) overseeing the Estate's business, (b) seeking buyers for the fuel tanks and steel building (and other items associated with the steel building), (c) assisting counsel with the Bethel Litigation, and (d) to generally assist with the plan of liquidation proposed hereunder. Mr. Adams will be paid $14,000 per month for his services from October 1, 2023, to December 31, 2023. Debtor is unaware of any insider transactions or conflicts of interest involving Mr. Adams or Don Bremner of the kind described in Local Rule 3016-2(b)(14). Mr. Adams is also working for AgWest to assist the Bank in liquidating the Relief Assets.

**H.** **Financial Information**. As reflected in its bankruptcy schedules, the Debtor's revenue has dropped precipitously since 2021 [Dkt. No. 44]. The Debtor's schedules reflect gross revenue of $5,080,453 in 2021, $1,360,067 in 2022, and $285,250 through the first five months of 2023. Creditors are advised to review the Debtor's bankruptcy schedules and these documents to fully understand the assets and liabilities of Debtor. Based on the opposition to logging that surfaced during 2019, Debtor's revenue dropped dramatically such that it defaulted with AgWest by the middle of 2020. Debtor has experienced substantial and continued financial struggles since that time.

To liquidate the Retained Assets, the Estate estimates the costs set forth in **Exhibit C**, which includes the costs of professionals (Draeger and Dorsey), as well as Mr. Adams, and Ms. Unruh, the bookkeeper. The estimate for revenue will depend on the sale price for the fuel tanks (estimated as $470,000), steel buildings/related materials (estimated as $750,000 to $850,000), and the Bethel Litigation proceeds (asserted claim is $470,000, plus any amount owed to Superior General Contracting, LLC, less any amount subject to offset by counterclaims). Debtor also received $160,000 in cash under the Term Sheet that it is allowed to use to administer the estate.

**THE FINANCIAL INFORMATION CONTAINED HEREIN AND IN THE ATTACHED EXHIBITS HAS NOT BEEN INDEPENDENTLY AUDITED FOR PURPOSES OF INCLUSION IN THIS DISCLOSURE STATEMENT. DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH NEITHER DEBTOR NOR ITS LEGAL OR FINANCIAL ADVISORS HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**

**I.** **Summary of Bankruptcy Case Events**. Debtor filed its voluntary bankruptcy petition on May 11, 2023. In the first few weeks of the case, Debtor responded to a Motion for Adequate Protection from log removal filed by David Spigai and a Motion for Adequate Protection and Objection to Unauthorized Use of Cash Collateral filed by AgWest. Debtor also filed its own Motion to Use Cash Collateral. Debtor and AgWest agreed to terms of an order regarding the use of cash collateral on June 20, 2023, and again on July 17, 2023.

On August 29, 2023, AgWest provided notice that it was terminating Debtor's authorization to further use cash collateral due to Debtor's failure to adhere to the terms of the previously agreed to cash collateral orders. A week later, AgWest filed its Motion for Stay Relief, requesting that the Court modify the automatic stay to allow it to exercise its rights against Debtor's collateral securing obligations owed to AgWest of nearly $14 million.

Debtor filed an initial Disclosure Statement and Chapter 11 Plan on August 30, 2023, but later withdrew those filings from consideration on the record at the evidentiary hearing on September 19, 2023, and formally by a withdrawal pleading filed on October 25, 2023.

Early in September 2023, due to health issues with its initial counsel, Debtor applied to employ Dorsey & Whitney LLP as co-counsel.  In the days that followed, Debtor filed a renewed Motion to Use Cash Collateral and an objection to AgWest's Motion for Stay Relief.  Each of the Motions was set for evidentiary hearing on September 19, 2023.  After the initial motions were filed, Debtor's board held a meeting on September 14, 2023, at which a resolution was passed to proceed to prepare a plan of reorganization with no timber harvesting and also authorizing a partial liquidation of the Debtor's assets.  The hearing was held on September 19, 2023, with both parties presenting valuation evidence and the Debtor presenting a plan for a partial or full liquidation of the assets of the estate.  The Court did not rule on the motions at the conclusion of the evidentiary hearing, instead encouraged the parties to consider settling the matter.  To facilitate those negotiations, the Court set a hearing to present final arguments on October 2, 2023.

On October 2, 2023, Debtor and AgWest jointly filed a Notice of Term Sheet Resolving AgWest Farm Credit Services, PCA's, Motion for Relief from Stay and Debtor's Motion for Use of Cash Collateral, attaching the Term Sheet as an exhibit.  On October 6, 2023, the Bankruptcy Court issued an order granting AgWest's Motion for Relief from Stay (as to the Relief Assets) and approving the settlement terms memorialized in the Term Sheet.

Pursuant to the Term Sheet, Debtor agreed to propose and file this Disclosure Statement and Plan of Liquidation by no later than October 31, 2023, and the parties to the Term Sheet agreed that Debtor would be allowed to pay allowed administrative claims and priority claims using its cash on hand and the proceeds of the Retained Assets.  The parties later agreed to extend the deadline for the filing of the Disclosure Statement and Plan of Liquidation to November 10, 2023.  AgWest retained its liens on the Retained Assets and also its right to continue to be a party--in-interest in the Bankruptcy Estate.  The Term Sheet reserved the right in AgWest to be paid the proceeds from the sale of all remaining assets after allowed administrative claims and priority claims, but it has since agreed that if there is excess after payment of the Administrative Expense Claims and Priority Unsecured Claims, General Unsecured Creditors can be paid up to 10% of the amount of their total Allowed General Unsecured Claims as part of the Plan.  Any excess will be paid to AgWest to the extent it has not already been paid in full through liquidation of the Relief Assets.

To implement the intent of the Term Sheet, AgWest, Kwaan, and the Debtor have entered into the Liquidation Cooperation Agreement, principally due to the impossibility of AgWest obtaining insurance for the tug and barge due to maritime laws and insurance restrictions and need for the employees to remain employees of the Debtor.  A copy of the Liquidation Cooperation Agreement is provided as **Exhibit B**.

## ARTICLE 2.
## BACKGROUND REGARDING PROPOSED PLAN

**A.**    **Formulation of the Plan**. Early in the case, Yak Timber contemplated an operational reorganization in which it would conduct logging and tug and barge hauling operations and pay its creditors using the profits from operations.  In connection with its efforts to proceed with an operational reorganization, it became apparent to Debtor that community opposition to continued logging operations would prevent it from continuing to profitably perform log hauling

operations.  At the September 14, 2023, Yak Timber board meeting, the "non-harvest" directive was passed and, as an extension of this change of direction, the board approved a "partial" liquidation approach (namely, selling the logging equipment to reduce the AgWest debt and, potentially, a reorganization based on cash flow derived from a stand-alone tug and barge operation).

AgWest opposed Debtor's continued use of the tug and barge under this debt reduction/reorganization concept.  After the hearing on September 19, 2023, AgWest and the Debtor discussed various resolutions.  After negotiations, the parties entered into the Term Sheet, pursuant to which Debtor carved out some proceeds of the Retained Assets to pay administrative and priority creditors, and Debtor agreed to put forth an orderly Plan of Liquidation as set forth in the Term Sheet, and later, in the Liquidation Cooperation Agreement.  The instant Combined Plan and Disclosure Statement is the result of the compromises reflected in the Term Sheet and the Court's Stay Relief Order.

**B.**     **Plan Treatment of Claims**.  A summary of the Classes of Claims and Equity Interests, treatment of Classes of Claims and Equity Interests, and distribution procedures is set forth below.  This Disclosure Statement DOES NOT summarize all of the provisions of the Plan.  The limited summary of the provisions contained below is qualified in its entirety by reference to the Plan, which shall be controlling for all purposes.

Holders of Claims and Equity Interests should read this Disclosure Statement and the Plan in their entirety prior to voting on the Plan.  No solicitation of votes may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code, and no person has been authorized to use any information concerning Debtor or their business to solicit acceptances or rejections of the Plan, other than information in this Disclosure Statement.

| CLASSES OF CLAIMS AND EQUITY INTERESTS | TREATMENT OF CLASSES |
|---|---|
| **Class 1. AgWest Secured Claim**<br><br>Total estimated amount of AgWest Secured Claim: $13,916,160.47 | Impaired and entitled to vote.<br><br>**Treatment.** The holder of the AgWest Secured Claim shall be paid all of the net proceeds from the sale of the "***Relief Assets***" as defined in the Term Sheet dated as of October 2, 2023, (the "***Term Sheet***") up to the amount of its Allowed Claim. AgWest shall also receive any excess proceeds from the sale of the "***Retained Assets***" (as defined in the Term Sheet) after payment of all Allowed Administrative Expense Claims, Priority Unsecured Claims and up to a 10% distribution to Allowed General Unsecured Claims. In other words, if there are sufficient net proceeds from the sale of the Retained Assets to pay Allowed Administrative Expense Claims and Priority Unsecured Claims in full, then the surplus net proceeds ("***Retained Asset Surplus Proceeds***") from the sale of the Retained Assets shall be paid to the holders of Class 2, Class 3, and Class 5 Claims on a pro rata basis until the members of such Classes have received a distribution representing 10% of their Allowed Claim amount.  If there are additional Retained Asset Surplus Proceeds after the holders of Class |

| | 2, Class 3, and Class 5 Claims have received distributions representing 10% of their Allowed Claims, then 100% of such additional Retained Asset Surplus Proceeds shall be paid to AgWest.<br><br>Estimated percentage recovery: 70-100% |
|---|---|
| **Class 2. Petro 49 Secured Claim**<br><br>Total estimated amount of Petro 49 Secured Claim: $412,435.24 | Impaired and entitled to vote.<br><br>**Treatment**. The holder of the Petro 49 Secured Claim will receive any net surplus proceeds of the liquidation of the Relief Assets above the amount of net surplus proceeds required to satisfy AgWest's Class 1 Allowed Claim in full. Debtor does not anticipate a distribution to Petro 49 as a result of the liquidation of the Relief Assets, which are subordinate to AgWest's senior, blanket lien.<br><br>Petro 49 is undersecured and shall be paid its Pro Rata Share (sharing with Class 5) of any Retained Asset Surplus Proceeds, up to a total distribution equal to 10% of its Allowed Claim. Distributions on account of the Petro 49's claim shall be made as soon as reasonably practicable based on the timing of the liquidation of the Retained Assets.<br><br>Estimated percentage recovery: up to 10% |
| **Class 3. Bush Kornfield LLP ("BKL") Secured Claim**<br><br>Total estimated amount of BKL Secured Claim: $20,000; unsecured claim $45,881.75 | Impaired and entitled to vote.<br><br>**Treatment**. The holder of the Bush Kornfield LLP ("**BKL**") Secured Claim [Proof of Claim No. 12] shall have the right to retain the money ($20,000) being held in trust and shall receive an unsecured claim for the remainder of its debt (approximately $45,000) as a Class 5 claimant, and shall receive its Pro Rata Share of any distribution to Class 5.<br><br>Estimated percentage recovery: 100% of the $20,000 Secured Claim; up to 10% on the portion of its Claim that is a General Unsecured Claim |
| **Class 4. Priority Unsecured Claims**<br><br>Total estimated amount of Allowed Priority Tax Claim: | Unimpaired and not entitled to vote.<br><br>**Treatment.** Allowed Priority Unsecured Claims shall be paid in full in Cash on the Effective Date provided there is sufficient cash in the Estate. The Priority Unsecured Claims shall be paid from the net proceeds from the sale of Retained Assets, in Cash, on the later of the Effective Date and the date upon which a Priority Unsecured Claim is Allowed, or within ten (10) days thereafter.<br><br>Estimated percentage recovery: 100% provided there are sufficient proceeds |

| $356,644.67 | after paying Administrative Expense Claims |
|---|---|
| **Class 5. Allowed General Unsecured Claims**<br><br>Total estimated amount of Allowed General Unsecured Claims: $1,605,489.60 | Impaired and entitled to vote.<br><br>**Treatment.** The holders of Allowed General Unsecured Claims (including any rejection claims related to the rejection of executory contracts and leases) shall be paid their Pro Rata Share (sharing with Class 2 and the unsecured portion of Class 3) of any Retained Asset Surplus Proceeds, up to a total distribution of 10% of their Allowed Claim amount. Distributions on account of Allowed General Unsecured Claims shall be made as soon as reasonably practicable.<br><br>Estimated percentage recovery: up to 10% |
| **Class 6. Equity Interests** | 100% impaired and deemed to have rejected the Plan.<br><br>**Treatment**. Holders of Equity Interests in the Debtor will not receive any distributions or other consideration under the Plan. The Debtor will be dissolved after the completion of the distributions under the Plan.<br><br>Estimated percentage recovery: 0% |
| **Unclassified: Administrative Expense Claims**<br><br>Total estimated amount of Allowed Administrative Expense Claims:<br><br>**$400,000** | Unimpaired and no statutory right to vote.<br><br>**Treatment.** Administrative Expense Claims shall be paid in full pursuant using the first available proceeds of the sale of Retained Assets, in Cash, on the later of the Effective Date and the date upon which an Administrative Expense Claim is Allowed, or within ten (10) days thereafter, subject to the availability of net proceeds from the sale of Retained Assets.<br><br>*U.S. Trustee Fees*: All accrued Chapter 11 quarterly fees due and payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), and any other fees payable under 28 U.S.C. § 1930 that may be determined at the Confirmation Hearing to be payable by Yak Timber, shall be Paid in Full on or within ten (10) days after the Effective Date and will continue to be paid when due until entry of a final decree closing the Case.<br><br>*Allowed Professional Compensation and Expenses*: Compensation and reimbursement of expenses of professionals relating to services performed on and after the Petition Date but before the Effective Date, to the extent such compensation and expense reimbursement has not been paid prior to the Effective Date and has been allowed by the Court on notice and application, shall be Paid in Full within ten (10) days after the entry of a Final Order |

|  | allowing such compensation and expense reimbursements. All applications by professionals for compensation and expenses under Section 507 and any requests for compensation or expenses for substantial contributions under Section 503 must be filed no later than sixty (60) days after the Effective Date. *Other Allowed Administrative Expense Claims*: Allowed Administrative Expense Claims other than for professionals and Priority Tax Claims will be Paid in Full by on the Effective Date. Estimated percentage recovery: 100% |

**C.    Alternatives to the Plan**.  Debtor believes that the Plan, based upon the compromises obtained by the Debtor under the Term Sheet, affords the holders of Claims and Equity Interests the potential for the greatest realization on their Claims and Equity Interests and, therefore, is in the best interest of such holder.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case; (b) alternative plans of reorganization; or (c) liquidation of Debtor under Chapter 7 of the Bankruptcy Code. **Without the carve out of proceeds from the Retained Assets that was the heart of the deal under the Term Sheet, it is estimated that there would be zero distribution to any estate creditors other than AgWest (and potentially the BKL Secured Claim).**

1.    Continuation of the Chapter 11 Cases.  If Debtor remains in Chapter 11 and the Plan as currently proposed is not confirmed within the time period projected, Debtor would have no funds and would need to convert to Chapter 7 immediately.  There is no operating restructure that is possible for the Debtor.

2.    Alternative Plans of Reorganization.  If the Plan is not confirmed, it is possible that Debtor or any other party in interest in the Chapter 11 Case could attempt to formulate and propose a different plan or plans on such terms as they may desire.  Given that the only path forward is the liquidation and distribution proposed under the current Plan, there is really no alternative to the current Plan.

3.    Chapter 7 Liquidation.  If no plan can be confirmed, Debtor's Chapter 11 Case would almost certainly be converted to a case under Chapter 7 of the Bankruptcy Code.  A business undergoing a Chapter 7 liquidation has no prospect of rehabilitation.  In a Chapter 7 case, an impartial trustee would be appointed to liquidate Debtor's assets.  The proceeds of the liquidation would be distributed to the respective holders of Claims against Debtor in accordance with the priorities established by the Bankruptcy Code, which would be consistent with the distributions proposed in this Plan.  If the Chapter 11 Cases were converted to one under Chapter 7 of the Bankruptcy Code, the present priority claims may have a priority lower than priority claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants, and other professionals the trustee may engage.  Conversion to Chapter 7, then, would create an additional layer of priority claims.  Thus, converting to Chapter 7 would introduce additional costs to the liquidation process and would likely take longer and result in less proceeds than allowing the Debtor to liquidate the Retained Assets.

**D.** **Liquidation Analysis**. Debtor believes that liquidation under Chapter 7 would result in a substantial diminution of the value of the estate because of the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other professionals to assist such trustee with a liquidation and distribution that is the same as that proposed under the Plan. Claims for payment of all those expenses would be entitled to first-priority administrative expense treatment ahead of the Chapter 11 administrative expenses. Furthermore, given existing management's knowledge of the Retained Assets and likely buyers, and given the holiday selling season that should be taken full advantage of to sell Debtor's assets at the best price, Debtor believes it can realize more from the sale of its assets than can a trustee. Accordingly, Debtor believes that all Creditors will receive more under the Plan than they would receive in the event of a Chapter 7 liquidation. Attached hereto as **Exhibit C** is Debtor's Liquidation Analysis assuming a Chapter 7 liquidation by a trustee.

The Debtor does not currently anticipate filing any actions pursuant to Chapter 5 of the Bankruptcy Code. The Debtor's investigation of such claims is ongoing and the proceeds of any such avoidance actions shall be treated in the same manner as the proceeds of the sale of Retained Assets. The Debtor shall provide all parties-in-interest with a notice of intent with respect to Chapter 5 avoidance actions on or before December 1, 2023.

**E.** **Means of Implementation of the Plan**.

1.     Funding the Plan. The proceeds of the liquidation of the Relief Assets shall be paid to AgWest as sales are completed until AgWest's Allowed Secured Claim has been satisfied in full or all Relief Assets have been sold. On or before the Effective Date, it is expected that *Debtor* will have Cash available from the sale of Retained Assets to fund distributions to other Classes of creditors besides AgWest as set forth herein. The Cash will be used to pay creditors as set forth in this Plan.

2.     Distributions Under the Plan. Debtor will make all distributions from the Retained Assets to holders of Claims under the Plan as *set* forth herein, **provided** that the proceeds of the Relief Assets shall be paid directly to AgWest and credited against the satisfaction of its Allowed Secured Claim.

3.     Timing of Payments and Distributions with Respect to Disputed Claims.

a.     Disputed Claims Reserve. Debtor will withhold from the Cash to be distributed to holders of Claims within a given Class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the Effective Date and will place such withheld property in the Reserve.

b.     Distributions in Respect of Disputed Claims. Payments and Distributions to holders of Disputed Claims, to the extent that such Claims or Equity Interests ultimately become Allowed Claims, will be made from the Reserve in accordance with the provisions of the Plan governing the Class of Claims to which the respective holder belongs.

c.     Surplus Distributions. Distributions under the Plan to holders of Allowed Claims that are unclaimed for a period of three (3) months after Final Distribution Date

shall revert to Debtor and the Claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.  Likewise, to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the Cash in the Reserve over the amount of Cash actually distributed on account of such Disputed Claim, shall revert to Debtor and the Claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.  All such reversions shall be distributed in accordance with the Plan.

### ARTICLE 3.
### RISK FACTORS

The Plan and its implementation are subject to certain risks.  Prior to voting on the Plan, creditors should read and carefully consider the risk factors discussed below, as well as the other information set forth in this Combined Plan and Disclosure Statement and the exhibits attached hereto or incorporated herein by reference.  The list of risk factors below is not exhaustive and should not be regarded as constituting the only risks present in connection with the Plan and its implementation:

- The Plan may not be confirmed.  Section 1129 of the Code sets forth requirements for confirmation of a Chapter 11 plan.  While Debtor believes that this Combined Plan and Disclosure Statement complies with or will comply with all of the requirements of Section 1129, the Bankruptcy Court may disagree and deny confirmation.

- There is no assurance that Debtor will be able to liquidate its assets for the projected returns.  Further, there can be no assurance that the Plan as proposed will be accepted by the requisite number of holders or amounts of Claims or approved by the Bankruptcy Court, and there can be no assurance that the Plan will not be modified up to and through the Confirmation Date.  Notwithstanding Bankruptcy Court approval, it is possible that the Plan may not be consummated because of other external factors that may adversely affect the funding of the distributions provided therein and/or the making of distributions.

- Change in composition of the board of Debtor.  A recent litigation in the Superior Court of the State of Alaska entitled *Bremner, Amanda et al v. Yak-Tat Kwaan, Incorporated et al.* (Case No. 3AN-23-06096CI) successfully ousted the current board of the Debtor and Kwaan pursuant to a judicial order dated October 27, 2023.  With the new board in place, it is possible that it may alter the direction of the Plan.

## PART TWO: PLAN OF LIQUIDATION

### ARTICLE 4.
### CLASSIFICATION AND TREATMENT OF CLAIMS
### AND INTERESTS UNDER THE PLAN

The Plan treats all Claims and Equity Interests fairly and equitably. The following is a brief summary of the Plan's treatment of Claims against and Equity Interests in Debtor. This summary is qualified in its entirety by reference to the provisions of the entire Plan. You are urged to read the Plan in its entirety. To the extent there is any conflict between the Disclosure Statement and the Plan, the terms of the Plan shall control.

The Plan designates six (6) Classes of Claims and Equity Interests taking into account their differing nature and priority as established under the Bankruptcy Code. The following is a summary of the Classes, Claims and Equity Interest types, and the treatment of Allowed Claims and Equity Interests under the Plan. Debtor has prepared the following chart in an effort to provide holders of Claims and holders of Equity Interests with Debtor's estimates of the expected outstanding amounts due and owing with respect to each Class of Claims as of the projected Confirmation Date, December 22, 2023. The calculations, percentages, and amounts set forth below are estimates which shall not affect the obligations of any party under the Plan.

Claims, other than Administrative Expense and Priority Tax Claims, are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

| **Class** | **Status** |
|---|---|
| Class 1 – AgWest Secured Claim | Impaired |
| Class 2 – Petro 49 Secured Claim | Impaired |
| Class 3 – BKL Secured Claim | Impaired |
| Class 4 – Priority Unsecured Claims | Unimpaired |
| Class 5 – General Unsecured Claims | Impaired |
| Class 6 – Equity Interests | Impaired |

## CLASS 1 – AGWEST SECURED CLAIM

**A.      Impairment and Voting.** Class 1 is impaired by this Plan. The holder of the AgWest Secured Claim is entitled to vote to accept or reject this Plan.

**B.      Treatment.** The holder of the AgWest Secured Claim shall be paid all of the net proceeds from the sale of the Relief Assets up to the amount of its Allowed Claim. AgWest shall also receive any excess proceeds from the sale of the Retained Assets after payment of all Allowed Administrative Expense Claims, Priority Unsecured Claims, and up to a 10%

distribution to Allowed General Unsecured Claims.  In other words, if there are sufficient net proceeds from the sale of the Retained Assets to pay Allowed Administrative Expense Claims and Priority Unsecured Claims in full, the Retained Asset Surplus Proceeds the sale of the Retained Assets shall be paid to the holders of Class 2, Class 3, and Class 5 Claims on a pro rata basis until the members of such Classes have received a distribution representing 10% of their Allowed Claim amount.  If there are additional Retained Asset Surplus Proceeds after the holders of Class 2, Class 3, and Class 5 Claims have received distributions representing 10% of their Allowed Claims, then 100% of such additional Retained Asset Surplus Proceeds shall be paid to AgWest.

## CLASS 2 – PETRO 49 SECURED CLAIM

**A.** **Impairment and Voting.**  Class 2 is impaired by this Plan.  The holder of the Petro 49 Secured Claim is entitled to vote to accept or reject this Plan.

**B.** **Treatment.**  The holder of the Petro 49 Secured Claim will receive any net surplus proceeds of the liquidation of the Relief Assets above the amount of net surplus proceeds required to satisfy AgWest's Class 1 Allowed Claim in full.  Debtor does not anticipate a distribution to Petro 49 as a result of the liquidation of the Relief Assets, which are subordinate to AgWest's senior, blanket lien.

Petro 49 is thus undersecured and shall be paid its Pro Rata Share (sharing with Class 3 and Class 5) of any Retained Asset Surplus Proceeds, up to a total distribution equal to 10% of its Allowed Claim.  Distributions on account of the Petro 49's claim shall be made as soon as reasonably practicable based on the timing of the liquidation of the Retained Assets.

## CLASS 3 – BKL SECURED CLAIM

**A.** **Impairment and Voting.**  Class 3 is impaired by this Plan.  The holder of the BKL Secured Claim is entitled to vote to accept or reject this Plan.

**B.** **Treatment.**  The holder of the BKL Secured Claim shall have the right to retain the money ($20,000, paid by Debtor) being held in trust and shall receive an unsecured claim for the remainder of its debt (approximately $45,000) as a Class 5 claimant and shall receive its Pro Rata Share of any distribution to Class 5.

## CLASS 4 – PRIORITY UNSECURED CLAIMS

**A.** **Impairment and Voting.**  Class 4 is unimpaired by this Plan.  Each holder of a Priority Unsecured Claim is deemed to have accepted this Plan and is not entitled to vote to accept or reject the Plan.

**B.** **Treatment.**  Priority Unsecured Claims shall be paid in full in Cash on the Effective Date provided there is sufficient cash in the Estate.  The Priority Unsecured Claims shall be paid from the net proceeds from the sale of Retained Assets, in Cash, on the later of the Effective Date and the date upon which a Priority Unsecured Claim is Allowed, or within ten (10) days thereafter.

## CLASS 5 – GENERAL UNSECURED CLAIMS

**A.    Impairment and Voting.**  Class 5 is impaired by this Plan.  Holder of General Unsecured Claims are entitled to vote to accept or reject this Plan.

**B.    Treatment.**  The holders of Allowed General Unsecured Claims (including any rejection claims related to the rejection of executory contracts and leases) shall be paid their Pro Rata Share (sharing with Class 2 and the unsecured portion of Class 3) of any Retained Asset Surplus Proceeds, up to a total distribution of 10% of its Allowed Claim.  Distributions on account of Allowed General Unsecured Claims shall be made as soon as reasonably practicable.

## CLASS 6 – EQUITY INTERESTS

**A.    Impairment and Voting.**  Class 6 is impaired by this Plan.  The Holder of the Debtor's Equity Interests is allowed to accept or reject this Plan.

**B.    Treatment.**  Holders of Equity Interests in the Debtor will not receive any distributions or other consideration under the Plan.  The Debtor will be dissolved after the completion of the distributions under the Plan.

## UNCLASSIFIED CLAIMS

**A.    Treatment**. Administrative Expense Claims shall be paid in full pursuant using the first available proceeds of the sale of Retained Assets, in Cash on the later of the Effective Date and the date upon which an Administrative Expense Claim is Allowed, or within ten (10) days thereafter, subject to the availability of net proceeds from the sale of Retained Assets.

**B.    Administrative Claims Bar Date.**  All applications for unpaid Administrative Expense Claims must be filed and served not later than thirty (30) days after the Effective Date of the Plan.  Debtor will provide notice to all known administrative expense claimants of the deadline for filing and application for payment in form substantially conforming to Alaska Local Bankruptcy Form 33 and consistent with Local Bankruptcy Rule 2016-3(c).

**C.    U.S. Trustee Fees**.  All accrued Chapter 11 quarterly fees due and payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), and any other fees payable under 28 U.S.C. § 1930 that may be determined at the Confirmation Hearing to be payable by Yak Timber, shall be Paid in Full on or within ten (10) days after the Effective Date and will continue to be paid when due until entry of a final decree closing the Case.

**D.    Allowed Professional Compensation and Expenses**.    Compensation and reimbursement of expenses of professionals relating to services performed on and after the Petition Date but before the Effective Date, to the extent such compensation and expense reimbursement has not been paid prior to the Effective Date and has been allowed by the Court on notice and application shall be Paid in Full within ten (10) days after the entry of a Final Order allowing such compensation and expense reimbursements.    All applications by professionals for compensation and expenses under Section 507 and any requests for compensation or expenses for substantial contributions under Section 503 must be filed no later than thirty (30) days after the Effective Date.

**E.**     **Other Allowed Administrative Expense Claims**. Allowed Administrative Expense Claims other than for professionals and Priority Tax Claims will be Paid in Full on or before the Effective Date.

<div align="center">

**ARTICLE 5.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

The Plan will be implemented by Debtor in a manner consistent with the terms set forth in the Plan and the Confirmation Order.  Implemental of the Plan includes the following primary actions:

**A.**     **Liquidation Cooperation Agreement**.  Debtor, AgWest, and Kwaan have agreed to liquidate the Debtor's assets pursuant to the Liquidation Cooperation Agreement attached hereto as **Exhibit B**.  To summarize, the Liquidation Cooperation Agreement provides, in relevant part:

- for the use of the Debtor's tug and barge to be used to transport Relief Assets to either Seattle, Washington, or Rainier, Oregon, for sale at an auction to be conducted by the Ritchie Brothers on December 21, 2023;

- the Relief Assets will remain titled and insured in Debtor's name throughout the sale process in order to minimize costs;

- Yak Timber's employees shall be employed in the loading and transportation of the Relief Assets, and vendors shall be paid as costs of liquidation arise, in each case to be funded by protective advances made by AgWest authorized under the AgWest Loan Documents, but paid through Yak Timber and covered by Yak Timber's insurances;

- for the liquidation of the Relief Assets, subject to changes as agreed to by the parties; and

- for a projected budget of the costs of liquidation as provided in **Exhibit B** to the Liquidation Cooperation Agreement.

All parties receiving this Combined Disclosure Statement and Plan of Liquidation are encouraged to thoroughly review the Liquidation Cooperation Agreement and the exhibits attached thereto. The sale of the Relief Assets shall be free and clear of liens pursuant to Bankruptcy Code § 363.

**B.**     **Debtor Liquidation of Retained Assets**.  The Debtor shall promptly liquidate the Retained Assets upon notice(s) to all parties-in-interest and motion(s) to be filed in the Bankruptcy Court.  The sale of the Retained Assets shall be free and clear of liens pursuant to Bankruptcy Code § 363.  The fuel tanks are presently subject to the lien of Nelson Distributing Inc., d/b/a Nelson Petroleum, pursuant to a purchase money security agreement later sought to be perfected by that certain UCC-1 Financing Statement No. 2023-006484-6 filed in District 500 (Alaska) filed in April 28, 2023, just thirteen (13) days prior to the Commencement Date of the Bankruptcy Case (the "*Nelson Lien*").  To the extent that the Nelson Lien was perfected by the UCC filing, the action to perfect is plainly avoidable as a preference pursuant to Section 547 of the Bankruptcy Code.  Nelson Petroleum filed its Proof of Claim No. 9 on August 17, 2023, characterizing the full amount of its claim as unsecured in recognition of the avoidability of the UCC filing.  At the time of this filing, the Debtor is seeking to enter into a stipulation for termination of the UCC-1 from Nelson Petroleum.

The proceeds of the liquidation of the Retained Assets shall be used to pay the Allowed Claims of Administrative Expense Claimants, Priority Unsecured Creditors, and, if sufficient net proceeds are available, up to a 10% distribution to General Unsecured Creditors.  Any excess

proceeds will be paid to AgWest no later than fifteen (15) days of the completion of the liquidation.

**C.** <u>**Completion of Liquidation**</u>. For the purposes of Alaska Local Bankruptcy Rule 3016-3(b), the liquidation shall be deemed concluded on the earlier of (1) March 31, 2024, of (2) the final date upon which all Relief Assets and Retained Assets have been liquidated. The pursuit of Chapter 5 avoidance actions and the administration of any proceeds derived therefrom shall continue after the completion of the liquidation of the Relief Assets and Retained Assets, and the proceeds of any Chapter 5 avoidance actions shall be distributed in the same manner as the proceeds of any Chapter 5 avoidance actions shall be distributed in the same manner as the proceeds of the sale of Retained Assets.

**D.** <u>**Section 1146(a) Exemption**</u>. Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, and implementation of, or as contemplated by the Plan, or the vesting, transfer or sale of the Relief Assets, or the Retained Assets pursuant to, as part of the implementation of, or as contemplated by the Plan, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, real estate excise tax, or similar tax or fee.

**ARTICLE 6.**
**PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN AND**
**TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED**
**ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS, AND EQUITY INTERESTS**

**A.** <u>**Voting of Claims and Equity Interests**</u>. Each holder of an Allowed Claim or an Allowed Equity Interest in an impaired Class of Claims or Equity Interests shall be entitled to vote separately to accept or reject this Plan as directed by the Bankruptcy Court.

**B.** <u>**Nonconsensual Confirmation**</u>. If any impaired Class of Claims or Class of Equity Interests entitled to vote shall not accept this Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, Debtor reserves the right to amend this Plan with the agreement of AgWest or undertake to have the Bankruptcy Court confirm this Plan under Section 1129(b) of the Bankruptcy Code or both.

**C.** <u>**Method of Distributions Under this Plan**</u>.

1. In General. Subject to Bankruptcy Rule 9010, all distributions under this Plan shall be made by Debtor to the holder of each Allowed Claim: (i) at the address of such holder as listed on the proof of claim filed by such holder; (ii) at the address of such holder as listed on the Schedules if no proof of claim has been filed, or (iii) at the address of such holder as contained in a written notice to Debtor of a change of address.

2. Distributions of Cash. Any payment of Cash made by Debtor pursuant to this Plan shall be made, at the sole option of Debtor, by check drawn on a domestic bank, wire transfer, or any other method mutually agreeable between Debtor and the payee. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

3. Minimum Distributions. No payment of Cash less than One Dollar and no 100/cents ($1.00) shall be made by Debtor to any holder of a Claim. Whenever *any* payment of

a fraction of a dollar under this Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**D.    Disposition of and Distributions Withheld for Disputed Claims**.

1.    Allowance of Certain Known Disputed General Unsecured Claims. Notwithstanding anything to the contrary in the Plan, the Debtor's Schedules, or the Proofs of Claim filed in the Bankruptcy Case, the unsecured claims of the following claimants shall be Allowed as General Unsecured Claims in the following amounts:

- Greatland Consulting             $32,500.00

- Internal Revenue Service         $80,310.40

- Legros Buchanan & Paul           $17,026.35

- Nelson Petroleum Company         $235,753.65

- The Landings at Colony           $16,485.20
  Wharf, LLC

- Petro 49 Inc. d/b/a Petro Marine  $412,435.24 (to the extent not paid from Relief
  Assets)                           Assets)

- Ridge Marine                     $515,533.00

- Schwabe Williamson & Wyatt       $86,333.51

- State of Alaska, DNR             $80,076.00

2.    Allowance of Certain Known Disputed Priority Unsecured Claims. Notwithstanding anything to the contrary in the Plan, the Debtor's Schedules, or the Proofs of Claim filed in the Bankruptcy Case, the unsecured claims of the following claimants shall be Allowed as Priority Unsecured Claims in the following amounts:

- City & Borough of Yakatat        $29,707,98

- Internal Revenue Service         $329,936.69

3.    Establishment and Maintenance of Reserve.  On the Effective Date and each Distribution Date thereafter, Debtor shall reserve from the distributions to be made on such Distribution Date to the holders of Allowed Claims in a particular Class, an amount of Cash equal to 100% of the distributions to which holders of Disputed Claims in such Class would be entitled under this Plan as of such dates as if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts (the "***Reserve***").

4.      Cash Held in Reserve.  Any Cash held in the Reserve shall be deposited in a segregated bank account or accounts in the name of Debtor and designated as held in trust for the benefit of holders of Disputed Claims to the extent such Disputed Claim is ultimately Allowed.  Cash held in the Reserve shall not constitute property of Debtor.

**E.      Distributions Upon Allowance of Disputed Claims**.  The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive distributions from the Reserve in accordance with and pursuant to the terms of this Plan within thirty (30) days of the date such Disputed Claim becomes an Allowed General Unsecured Claim pursuant to a Final Order.  Such distributions shall be made in accordance with this Plan based upon the distributions that would have been made to such holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date, without any post-Effective Date interest thereon.

**F.      Surplus Distributions to Holders of Allowed General Unsecured Claims**.  Surplus Distributions shall revert to Debtor and the Claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.  All such Surplus Distributions that revert to Debtor shall be distributed to the holders of Claims or Equity Interests, as the case may be, in accordance with this Plan.

**G.      Objections to and Resolution of Administrative Expense Claims, Claims, and Equity Interests**.  Except as to applications for allowances of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code, Debtor shall have the exclusive right to make and file objections to Administrative Expense Claims, Claims, and Equity Interests subsequent to the Confirmation Date or as otherwise ordered by the Bankruptcy Court.  All objections shall be litigated to Final Order; *provided, however*, Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections, without approval of the Bankruptcy Court after the Effective Date.

### ARTICLE 7.
### CONDITIONS TO THE EFFECTIVE DATE; SUBSTANTIAL CONSUMMATION

**A.      Confirmation Order**.  This Plan shall be null and void and have no force or effect unless the Bankruptcy Court shall have entered an order confirming this Plan in accordance with Chapter 11 (the "***Confirmation Order***"), which order shall be a final order.

**B.      Other Conditions**.  The occurrence of the "***Effective Date***" shall be subject to the satisfaction or waiver of the following conditions within one hundred eighty (180) days after the date on which the Confirmation Order is entered by the Bankruptcy Court: (1) Sufficient net proceeds from the sale of Retained Assets are available to pay all Priority Unsecured and Administrative Expense Claims in full and (2) All payments required under the Plan to be made on or before the Effective Date shall have been made.  If for any reason the Effective Date does not occur within one hundred eighty (180) days after the date on which the Confirmation Order is entered by the Bankruptcy Court, then the Confirmation Order shall be void and the Plan shall have no force or effect.

**C.**     **Substantial Consummation**.  For the purposes of Alaska Local Bankruptcy Rule 3016-3K(b), the Plan shall have been substantially consummated, as defined in Section 1101(2) of the Bankruptcy Code, upon the first date that (1) the liquidation of all Retained Assets has been completed, and (2) the first Distribution is made pursuant to the terms of this Plan.

**ARTICLE 8.**
**EFFECT OF PLAN CONFIRMATION**

**A.**     **No Discharge**. The Plan shall not discharge any Debtor from any Claim or "debt" (as that term is defined in Section 101(12) of the Bankruptcy Code), or Debtor's liability in respect thereof.

**B.**     **Good Faith**.  Confirmation of this Combined Plan and Disclosure Statement shall constitute a finding that (i) the Combined Plan and Disclosure Statement has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (ii) the solicitation of acceptances or rejections of this Combined Plan and Disclosure Statement has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.**     **Injunction**. Except as otherwise expressly provided in this Plan or the Confirmation Order, all entities who have held, hold, or may hold Claims against or Equity Interests in Debtor are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against Debtor on account of any such Claim or Equity Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against Debtor or against the property or interests in property of Debtor on account of any such Claim or Equity Interest, and (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from Debtor or against the property or interests in property of Debtor on account of any such Claim or Equity Interest.  Such injunction shall extend to successors of Debtor (including, without limitation, Debtor) and its respective properties and interests in property.

**D.**     **Tax Consequences**.

     1.     Cancellation of Indebtedness.  In general, the Tax Code, with certain exceptions, provides that taxpayers that realize a "cancellation of indebtedness" must include the amount of canceled indebtedness in gross income to the extent that the indebtedness canceled exceeds any consideration given for such cancellation.  The Tax Code further provides, however, that where the taxpayer is in a Chapter 11 case and the cancellation of indebtedness is pursuant to a plan approved by the bankruptcy court, such cancellation of indebtedness will not be included in gross income, but the taxpayer must generally reduce tax attributes in a specified order.

     Debtor expects to realize cancellation of indebtedness ("***COD***") income as a result of the Plan.  With certain exceptions, to the extent that any creditor receives from a Debtor a distribution under the Plan in an amount less than such creditor's Claim, Debtor will realize COD income. Because Debtor is in bankruptcy, it will not be required to include COD income in taxable income but, rather, will be required to reduce its accumulated net operating loss carryforwards ("***NOLs***") (and possibly certain other tax attributes, including tax basis of assets) by the amount of the COD income.  Tax attributes must be reduced in the order specified as follows: (i) NOLs, (ii) business credits, (iii) minimum tax credits, (iv) capital loss carry-overs, (v) tax basis in assets, (vi) passive

activity losses and credits, and (vii) foreign tax credit carry-overs.  In lieu of this order, however, Debtor may elect to apply any portion of the reduction to reduce the basis of its depreciable assets first.  Debtor will determine whether or not this election should be made.

2.      Realization and Recognition of Gain or Loss in General.  Generally, the holder of an Allowed Claim will realize a gain or loss in the exchange of his Allowed Claim for the consideration received by the holder under the Plan.  The amount of realized gain will be equal to the difference between (a) the sum of the amount of any Cash and the fair market value (generally issue price in the case of debt obligations received under the Plan) of other consideration received, and (b) the adjusted basis of the Allowed Claim exchanged therefore.  However, whether such realized gain or loss will be recognized (i.e., taken into account) for federal income tax purposes will depend in part upon whether such exchange qualifies as a "recapitalization" as defined in the Tax Code.  Furthermore, even if the exchange constitutes a recapitalization, it will nevertheless be fully taxable unless the Claim exchanged is classified as a "security" for federal income tax purposes and any note received in the exchange may be treated for this purpose as if it were cash unless such note also constitutes a "security" for federal income tax purposes.

The term "security" is not defined in the Tax Code or the Regulations.  Whether a debt instrument constitutes a "security" depends on an overall evaluation of the facts and circumstances surrounding the nature of the debt instrument, with the term of the debt instrument usually regarded as the most important factor.  In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security.  As a rule of thumb, a corporate debt obligation evidenced by written instruments having a term of ten (10) or more years, when issued, will be classified as a security, and an instrument having an original maturity of five (5) years or less, or arising out of the extension of trade credit, will not.  Debt instruments having a term of between five (5) years and ten (10) years are often treated as securities but may not be, depending on all the relevant factors.

Debtor express no views with respect to whether Claims or any new obligations exchanged therefore constitute securities for tax purposes.  Each holder of a Claim is urged to consult such holder's own tax advisor in this regard.

3.      Holders of Claims Whose Allowed Claims Do Not Constitute Securities.  A holder of a Claim who exchanges an Allowed Claim that does not constitute a security will recognize gain or loss on the exchange in an amount equal to the difference between the holder's tax basis in the Allowed Claim and the amount realized on the exchange.  For tax purposes, the amount realized will be the amount of Cash received, if any, plus the fair market value of any stock or other property received (in the case of debt obligations received, generally the issue price of such obligations).  The tax basis of property received will be the fair market value of such property on the date of exchange, and the holding period for such property will begin on the day following such date.

4.      Character of Gain or Loss.  The character of the various potential gains, losses, and income described above as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of actors.  These factors include whether the particular Claim constitutes a capital asset in the hands of the Claim holder, whether the Claim has been held for more than one (1) year, whether the Claim was purchased at a discount, and whether

and to what extent the Claim holder has previously claimed a bad debt deduction with respect to such Claim.

**HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS ABOUT THE PROPER ALLOCATION OF CONSIDERATION BETWEEN PRINCIPAL AND INTEREST.**

## ARTICLE 9.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      <u>**Rejection of Executory Contracts and Unexpired Leases.**</u>  Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases entered into prior to the Commencement Date that exist between Debtor and any person shall be rejected by Debtor as of the Effective Date.  The known executory contracts of the Debtor that existed as of the petition date that are rejected under the Plan are the prepetition Marketing Agreement with IFP.  To the extent that the holder of a Claim arising from the rejection of any contract, agreement, or lease asserts a Secured Claim, Debtor may file a motion under Section 506 of the Bankruptcy Code to limit the amount of such Secured Claim, an adversary proceeding to avoid the Security Interest taken for such Claim, and/or an objection to the Claim itself.  To the extent any Claim arising out of an executory contract or expired lease is unsecured, such Claim shall be treated as a General Unsecured Claim under Class 5 of this Plan.

B.      <u>**Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases**</u>.  Entry of the Confirmation Order shall constitute the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to this Plan.

C.      <u>**Procedure**</u>.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to this Plan must be filed with the Bankruptcy Court and served upon Debtor, or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the notice of entry of the Confirmation Order.  Any Claims not filed within such time will be forever barred from assertion against Debtor, its Estate, and its property.  Debtor shall have until sixty (60 days) after a proof of Claim filed in accordance with this Article 4 to file an objection to such Claim.

D.      <u>**Compensation and Benefit Programs**</u>.  All employment practices and policies, and all compensation and benefit plans, policies, and programs of Debtor applicable to its officers or employees, including, without limitation, all savings plans, health care plans, workers' compensation programs, and insurance plans are treated as executory contracts under this Plan and are hereby rejected pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

## ARTICLE 10.
## MISCELLANEOUS

A.      <u>**Effectuating Documents and Further Transactions**</u>.  Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**B.** **Corporate Action**.  On the Effective Date, all matters provided for under this Plan that would otherwise require approval of the stockholders or directors of Debtor or their successors in interest under this Plan shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the State of Alaska, without any requirement of further action by the stockholders or directors of Debtor or Debtor.

**C.** **General Retention of Jurisdiction**.  The Court shall retain jurisdiction of the Case pursuant to and for the purposes set forth in Bankruptcy Code Sections 1127(b) and 1141 through 1146 to enforce the provisions of this Plan and to ensure that its intent and purposes are carried out and given effect.

**D.** **Specific Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction to consider any modification or amendment to this Plan and to hear and determine (i) the classification, allowance, and disallowance of Claims and Interests, and any objections thereto, to the extent consistent with this Plan; (ii) all controversies, suits, and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan; (iii) all controversies, suits, and disputes, if any, as may arise with respect to the period before the Effective Date between any party-in-interest and Debtor; (iv) all claims or causes of action which may exist on behalf of Debtor arising before the Effective Date, whether or not the subject of an action pending as of the Effective Date, to the extent consistent with this Plan, including all claims and causes of action preserved by the immediately preceding paragraph; (v) applications for the allowance of compensation and reimbursement of expenses to professional persons; (vi) the validity and/or priority of any liens on, security interests in, or ownership or other interests in, Debtor or property of Debtor, to the extent consistent with the Plan; (vii) any and all applications, adversary proceedings, contested and/or litigated matters pending on the Effective Date; (viii) all controversies as provided for in the Confirmation Order; (ix) any proceedings to estimate Claims for the purpose of allowance; (x) all proceedings to enforce performance of the Plan against any Person; and (xi) all proceedings regarding the assumption, rejection, assignment, or termination of executory contracts and unexpired leases of Debtor.  The Bankruptcy Court's retention of jurisdiction shall be without prejudice to any party's right to seek a withdrawal of the reference, transfer of venue, abstention, or other relief to pursue adjudication of a claim, Cause of Action, or other proceeding in a court other than the Bankruptcy Court.

**E.** **Exculpation**.  Neither Debtor, nor any of its respective members, officers, directors, employees, advisors, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in or arising out of the Chapter 11 Case, the pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, or the property to be distributed under this Plan, except for willful misconduct or gross negligence, and, in all respects, Debtor, and each of its respective members, officers, directors, employees, advisors, and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; *provided, however*, nothing contained herein shall exculpate, satisfy, discharge, or release any Cause of Action accruing to Debtor and Debtor-in-Possession under Sections 547, 548 and 550 of the Bankruptcy Code against present or former

officers, directors, or employees of Debtor in their capacities other than as present or former officers, directors, or employees.

       **F.**    **Amendment or Modification of this Plan**.   Alterations, amendments, or modifications of this Plan may be proposed in writing by Debtor at any time prior to the Confirmation Date, provided that this Plan, as altered, amended, or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and Debtor shall have complied with Section 1125 of the Bankruptcy Code.  The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended, or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms this Plan, as altered, amended, or modified, under Section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications.  A holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

       **G.**    **Reservation of Rights**.   Neither the filing of this Plan nor any statement or provision contained herein, nor the taking of any action by Debtor or a Plan Sponsor with respect to this Plan, shall be or be deemed to be an admission or a waiver of any rights before the Effective Date.  In the event the Plan is not confirmed or the Effective Date does not occur, no statement contained herein may be used or relied upon in any manner in any suit, action, proceeding, or controversy, within or outside of the Case, against Debtor or a holder of a Claim.

       **H.**    **Severability**.   In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in this Plan is invalid, void, or unenforceable, such provision shall be invalid, void, or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void, or unenforceable.  The invalidity, voidness, or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

       **I.**    **Revocation or Withdrawal of this Plan**.   Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date.  If Debtor revokes or withdraws this Plan prior to the Confirmation Date, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any claims by or against Debtor or any other person or to prejudice in any manner the rights of Debtor or any person in any further proceedings involving Debtor.

       **J.**    **Binding Effect**.   The Plan shall be binding upon and inure to the benefit of Debtor, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, Debtor.

       **K.**    **Notices**.   All notices, requests, and demands to or upon Debtor or Debtor' counsel to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by

facsimile transmission, when received and telephonically confirmed, with a copy by mail, addressed as follows:

> *If to Debtor*:
>
> Yak Timber, Inc.
> Attn: President
> P.O. Box 236
> Yakutat, Alaska 99689
>
> *with a copy to*:
>
> Dorsey & Whitney LLP
> Attn: Michael R. Mills
> 1031 West 4th Avenue,
> Suite 600
> Anchorage, Alaska 99501
> Telephone: (907) 276-4557
> Facsimile: (907) 276-4152

**L.** **Governing Law**.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, or to the extent an exhibit to this Plan or other document executed in connection with this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Alaska, without giving effect to the principles of conflicts of law of such jurisdiction.

**M.** **Withholding and Reporting Requirements**.  In connection with the consummation of this Plan, Debtor, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**N.** **Allocation of Plan Distributions Between Principal and Interest**.  Except as otherwise expressly provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**O.** **Headings**.  Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

**P.** **Exhibits.**  All exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

**Q.    Filing of Additional Documents**.  On or before substantial consummation of this Plan, Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

Dated this 14th day of November, 2023.


*/s/ Michael R. Mills*
Michael R. Mills


I hereby certify that a copy of the foregoing was served this 14th day of November, 2023 through the CM/ECF filing system.


By: */s/ Melody Nardin*
        Legal Assistant